IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No.  02-cv-01993-WYD-BNB

JEFFREY SCOTT BEEBE,

      Plaintiff,

v.

JOE STOMMEL, et al.,

      Defendants.
_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
_____

THIS MATTER came before the Court on a one day trial to the Court on Tuesday, September 19, 2006.  The case involves claims for substantive and procedural due process in connection with Plaintiff's termination from the Sex Offender Treatment Monitoring Program ["SOTMP"].  This addresses my findings of fact and conclusions of law in connection with Plaintiff's claims.

## FINDINGS OF FACT

1.      At all times pertinent hereto, Plaintiff Jeffery Scott Beebe ["Beebe" or "Plaintiff"], No. 108302, was a state prisoner of the Colorado Department of Corrections ["CDOC"].  As of the filing of the Complaint, Plaintiff was housed at the Kit Carson Correctional Center in Burlington, Colorado, and is currently incarcerated at said facility.

2.      At the time Beebe was terminated from the Sex Offender Treatment and Monitoring Program ["SOTMP"], he was being held in the Fremont Correctional Facility.

3.      Peggy Heil ["Heil"] was the SOTMP Administrator for the CDOC when Plaintiff filed his complaint, and was responsible for the system-wide clinical functioning of the SOTMP as well as the development of system-wide procedures regarding sex offender treatment and termination thereof.

4.      Heil is no longer an employee of the CDOC and is no longer a party to this case.  Joe Stommel is the current Program Administrator of SOTMP with the CDOC and was substituted for Heil as a party by Minute Order filed July 18, 2006.

5.      At all times pertinent hereto, Defendant Sally Chapman ["Chapman"] was a social worker/counselor III for the CDOC and a therapist in the sex offender treatment group from which Plaintiff was terminated.  She was responsible for making decisions as to probation and termination of inmates from the group and, in particular, the termination of Plaintiff from treatment.

6.      At all times pertinent hereto, Defendant Mitch Mestas ["Mestas"] was a mental health therapist for the CDOC, a therapist in the sex offender treatment group from which Plaintiff was terminated, and was responsible for making decisions as to probation and termination of inmates from the group.  In particular, he was responsible, with Defendant Chapman, for the termination of Plaintiff from treatment.

7.      At all times pertinent hereto, Defendant Joseph Ortiz ["Ortiz"] was the Executive Director of the CDOC, responsible for managing, supervising and controlling the correctional institutions operated and supported by the State of Colorado, as well as for developing policies and procedures governing the operation of the CDOC, including SOTMP.

8.      Plaintiff pled guilty to a sex offense, as such offense is defined in COLO. REV. STAT. § 18-3-305(1), and pursuant to COLO. REV. STAT. § 16-13-804 (presently codified as COLO. REV. STAT. § 18-1.3-1004).  He was sentenced on February 20, 2001, to a to an indeterminate sentence of a minimum of three years and a maximum of his natural life in incarceration.

9.      At the time of his termination from sex offender treatment, May 15, 2002, Plaintiff had served the minimum period of his sentence to incarceration.

10.     Plaintiff is required as part of his sentence to incarceration to undergo sex offender treatment to the extent appropriate pursuant to COLO. REV. STAT. § 16-11.7-105.

11.     The CDOC's SOTMP is the treatment program for providing sex offender treatment.  SOTMP provides psychoeducational and psychotherapeutic services to offenders who have committed sex offenses.

12.     SOTMP is operated by the CDOC, and is governed by CDOC's Administrative Regulation 700-19.  SOTMP establishes the general scope and limits of sex offender treatment services provided to offenders within the CDOC.

13.     The September 15, 2002 CDOC Administrative Regulation 700-19, IV.F.6. (IV.F.5. in the September 1, 2004 version of 700-19), "Criteria for Treatment", provides that: "The offender must comply with the conditions of the group contract.  This contract will explain expectations, responsibilities and termination criteria."

14.     Administrative Regulation 700-19 IV.G., effective September 1, 2004, provides as follows:  "In 1998 the Colorado Legislature passed the Colorado Lifetime

Supervision Act.  Under this sentence offenders must serve the term of their minimum sentence in prison and participate and progress in treatment in order to be considered a candidate for parole.  The Department of Corrections shall provide treatment formats which give offenders the opportunity to progress in treatment and be considered a candidate for parole within the time period of their minimum sentence."

15.     As administrators, Defendants Heil and Ortiz were responsible for the content of SOTMP Standards and Guidelines, including CDOC Administrative Regulation 700-19, IV.F.6. (IV.F.5. after September 1, 2004), Phase I Treatment Contract and CDOC Termination Guidelines, and had opportunity to deliberate in devising same.

16.     In the context of the Colorado Sex Offender Lifetime Supervision Act of 1998, the term "treatment" means:  therapy, monitoring, and supervision of any sex offenders, which conforms to the standards created by the Colorado Sex Offender Management Board, and includes sex-offense-specific treatment.

17.     Phase I is a therapy group provided by SOTMP.

18.     Sex offenders are required to complete the Phase I therapy group in order to be eligible to participate in Phase II of SOTMP.

19.     Per SOTMP Standards and Guidelines, Plaintiff was required to sign a "Phase I Treatment Contract" in order to be eligible to participate in Phase I of SOTMP. The contract defined group responsibilities as well as therapist responsibilities, and was signed by Defendant Chapman as well as the Plaintiff.

20.     Pursuant to the terms of the Phase I Treatment Contract, contact with a minor by a group member could result in that group member being placed on probation from Phase I, or could result in that group member being terminated from Phase I.  The Contract Acknowledgement stated:  "I understand that if I breech [sic] any condition of this contract that I may be placed on probation or be terminated from the group.  I am aware that information about my treatment will be released to case managers, working/ department file, parole officers, the Parole Board, and community corrections centers and boards."

21.     Plaintiff met all prerequisites for eligibility to participate in Phase I and was admitted to and began participation in a Phase I therapy group on or about September 20, 2001.

22.     Under the terms of the Phase I Treatment Contract, therapists Chapman and Mestas were responsible for monitoring the group members of the Phase I therapy group in which Plaintiff was a member, to make sure that they were following the treatment contract.  They were also responsible for placing a group member on probation or terminating a group member who failed to comply with the treatment contract.

23.     On or before May 15, 2002, Defendant Mestas came into possession of a letter which was addressed to Plaintiff, had a foreign return address, and stated in the body of the letter that the author of the letter was a seventeen-year-old female ("I'm Michelle . . ., 17 yrs of age.  I was born on January 02, 1985 . . .").  The referenced letter was confiscated before Plaintiff received it.  Plaintiff testified that he did not know

that the author of the letter whom he had initially written was a minor, and Defendants

did not present any evidence to the contrary.  In that regard, Plaintiff gave a plausible

explanation as to why he thought the person he was corresponding with would not be a

minor—he stated that he was informed the person was a college student, and that he

believed such students are between 18 and 22 years of age.  The letter lends some

support to Plaintiff's claim, as it announces the minor's age as if for the first time ("I'm

Michelle. . ., 17 yrs of age").

24.     In accordance with the SOTMP Standards and Guidelines, on or about

May 15, 2002, Defendants Chapman and Mestas, with opportunity to deliberate,

recommended to the facility sex offender treatment team that Plaintiff be terminated

from treatment for allegedly having contact with a minor because of the referenced

letter.  Defendants Chapman and Mestas participated in the facility sex offender

treatment team where, with opportunity to deliberate, they and other members of the

team reached a consensus to terminate Plaintiff from sex offender treatment for

allegedly having contact with a minor in violation of the SOTMP Phase I Treatment

Contract.

25.     Plaintiff testified, and Chapman confirmed, that other persons in SOTMP

Phase I treatment who accidentally came into contact with a minor, *i.e*, had contact with

a minor that was not intentional, were not terminated from the program but were

allowed to bring that contact up in group therapy and receive instructions as to how to

make sure that contact never occurs again.  Plaintiff was not permitted to do this.

Instead, he  was terminated from the program even before he received a copy of the

letter which he testified informed him for the first time that the person he wrote to was a minor.  Chapman testified that it was irrelevant to her decision to terminate Plaintiff from treatment that Plaintiff did not know the person he wrote the letter to was a minor, because she testified it was incumbent on him to verify that any person he had contact with was not a minor before the contact.

26.     On or about May 15, 2002, Plaintiff received a CDOC Memorandum, dated May 15, 2002, to Inmate Beebe DOC #108302 from Defendants Mestas and Chapman Re: SOTMP Treatment Termination.  The Memorandum stated "effective this date, you have been terminated from the Sex Offender Treatment and Monitoring Program Phase I or Therapeutic Community.  The reason for termination is: *** B. X Inmate was terminated without a period of probation for the following reason: *** X Violation of treatment contract. *** Written contact with minor female."  Prior to this notice, Plaintiff was provided oral, not written, notification of the grounds for his said termination.  Upon receipt of this Memorandum, on or about May 15, 2002, Plaintiff was directed to leave the Phase I therapy group and return to his cell house.

27.     Defendant Chapman testified that, in addition to Plaintiff's contact with a minor female by letter, the decision to terminate Plaintiff was also based on inappropriate correspondence that Plaintiff was engaging in with Texas inmates that was of a sexually explicit nature and was a violation of the Treatment Contract because those adult inmates had minor children.  However, this was not identified as a basis for termination in the May 15, 2002 Memorandum.  The Memorandum also did not provide

as a basis for termination that Plaintiff failed to verify before sending the letter that the person he was writing to was not a minor.

28.     The SOTMP Standards and Guidelines, section IV.F. "Criteria for Treatment", Phase I Treatment Contract and the CDOC Termination Guidelines do not provide, and did not provide at the time of Plaintiff's termination from sex offender treatment, for written notice of charges as to termination of treatment before the actual termination.  They also do not provide, and did not provide at the time of Plaintiff's termination, for a due process hearing with opportunity to present evidence or testimony pertaining to such termination.

29.     Instead, the procedures set forth in the SOTMP Termination Guidelines were followed.  Those Guidelines state as to termination:

> When a therapist feels it is important to terminate an inmate from group, he/she will present the reason for termination to the facility sex offender treatment team.  In some situations it will be necessary to terminate the inmates participation in group immediately.  If the inmate's presence in group constitutes a dangerous situation, the therapist may terminate the inmate from group, but will review the termination with the facility team the next working day.  Termination should generally follow periods of probation except under the . . . circumstances . . . [of] Unexcused Absences.

30.     Plaintiff's presence in SOTMP Phase I group sex offender treatment did not constitute a dangerous situation to the physical well-being of others in the group.  Also, on May 15, 2002, there was no prison riot in progress.

31.     The SOTMP does not utilize due process proceedings in terminations of sex offender treatment.  Chapman testified that due process proceedings in a therapeutic setting would not be feasible as such proceedings would necessitate the

involvement of third persons who would be inexperienced and untrained in the dynamics of sex offenders, and that it would also be a violation of confidentiality, jeopardizing the therapeutic process.

32.     The SOTMP Termination Guidelines were applied to Plaintiff.

33.     Plaintiff did not receive advance written notice of charges respecting termination of sex offender treatment, but he did receive written notice of termination on May 15, 2002 with an explanation as to the purported grounds therefor.  He did not, however, receive written notice in that memorandum as to another purported ground for termination; namely, the alleged inappropriate correspondence with Texas inmates.  He was not permitted by Defendants Chapman and Mestas to have a due process hearing and he was not questioned about the subject letter prior to termination.  He was also not allowed to testify or present evidence or testimony on his behalf to counter the allegations giving rise to the determination to terminate him from treatment.

34.     Under the SOTMP Standards and Guidelines, Plaintiff may re-enter the SOTMP treatment program 90 days after termination upon satisfactory completion of SOTMP conditions.  Specifically, Plaintiff would have to write a 4-5 page paper in which he admits and discusses his alleged inappropriate correspondence with a minor, and how this behavior relates to his conviction.

35.     Further, per the SOTMP Standards and Guidelines, Treatment Contract and Termination Guidelines, in order to be eligible for re-entry into the Phase I therapy group Plaintiff must admit that he had contact with a minor, and comply with the

conditions referenced in the previous paragraph.  Plaintiff has refused to do this, because it is his position that he did not knowingly contact a minor.

36.     The CDOC has an administrative grievance process set forth in its regulations, CDOC Administrative Regulation No. 850-4.  Inmates are required to submit a formal, written Step I grievance addressed to the staff members involved in the grievance issue within 30 calendar days from the date the offender knew or should have known of the facts giving rise to the grievance.  If the Step 1 grievance is denied, inmates must then file a formal, written Step II with the administrative head or designee in the facility where the inmate is incarcerated.  If the Step II grievance is denied, inmates must then proceed to Step III, the final step in the formal grievance process. Step III grievances are submitted directly to the Step III grievance officer (an independent contractor who is not a CDOC employee) by the inmate.

37.     Plaintiff participated in all three steps of the grievance process.

38.     In the June 25, 2002, CDOC Grievance Form, Plaintiff stated that he was "arbitrarily and erroneously dismissed from mandated treatment" and that he "should be reinstated in group . . . since . . . [he is] not refusing treatment", and "a system should be created so that persons similarly situated will receive due process . . . prior to being denied statutorily mandated treatment."

39.     On August 30, 2002, the CDOC issued its final written decision to Plaintiff, wherein it was stated: "Your request for relief is denied. This is the final administrative response in this matter and you have exhausted the grievance process." Plaintiff's June 25, 2002, request has not been accommodated to-date.

40.     Plaintiff has not refused re-entry into sex offender treatment.

41.     Plaintiff has not been reinstated into sex offender treatment to-date.

42.     Plaintiff applied for parole in October, 2002.  The application was deferred until April, 2003.  Plaintiff waived further application to and appearance before the Parole Board until October, 2004, when he met with a Parole Board member for the purpose of determining whether he should be considered and recommended for parole. Subsequent to that meeting, the Parole Board further deferred Plaintiff's application.

43.     Since the inception of the Colorado Sex Offender Lifetime Supervision Act of 1998, the Parole Board has seen 182 Lifetime Supervision offenders for release consideration.  Two offenders were granted release to parole as of September 30, 2005.  Five lifetime sex offenders have been accepted and placed in transition community corrections out of fourteen offenders who have met Sex Offender Management Board criteria for a community corrections recommendation.  Two lifetime sex offenders are currently in community corrections programs as of September 30, 2005.  All of the lifetime sex offenders who have been paroled or placed in transition community corrections have received sex offender treatment while incarcerated.

44.     Regarding "eligibility for parole", although Plaintiff may apply for parole without having obtained sex offender treatment in incarceration, Colorado statutory law does not permit him to be released on parole without a determination as to progress in treatment.

45.     Pursuant to the Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders issued by the

-11-

Colorado Sex Offender Management Board ["SOMB"], criteria for release from parole include "[r]equired participation" in the SOTMP, and "[d]emonstrated participation in all recommended programs."

46.     Further, as stated previously, pursuant to Administrative Regulation 700-19, sex offenders serving under the Colorado Lifetime Supervision Act "must participate and progress in treatment in order to be considered a candidate for parole."

47.     Allan F. Stanley ["Stanley"], the Chairman of the Parole Board, testified that while there is a possibility that some sex offenders may be paroled without participation in the sex offender treatment program or if they were terminated from the program, this possibility does not apply to those sex offenders who have been sentenced under the Colorado Lifetime Supervision Act.  As to the offenders sentenced under that Act, Stanley testified that they must complete sex-offender treatment or at least be actively participating in treatment in order to receive parole.  While Stanley later testified somewhat inconsistently with this, stating that there is a possibility that such a sex offender could get paroled without treatment in the SOTMP, I find this later testimony is based on speculation and is not credible given the statutory and administrative scheme in place and his previous testimony.

<u>CONCLUSIONS OF LAW</u>

A.    <u>General</u>

1.     This Court has jurisdiction over the federal claims herein pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

2.     Plaintiff's claims for prospective injunctive and declaratory relief, namely: (a) declaration of a liberty interest in continued sex offender treatment; (b) reinstatement into treatment on the basis that his procedural and substantive due process interests were violated when he was removed from treatment; and (c) a declaration that the subject CDOC Regulation is null and void because it is facially and as applied in violation of the Fourteenth Amendment liberty interest and Due Process Clause, are properly asserted under 42 U.S.C. § 1983.  *See Beebe v. Heil,* 333 F. Supp.2d 1011, 1014 (D. Colo. 2004).

3.     Plaintiff has satisfied the exhaustion of administrative remedies requirement.

4.     Plaintiff's suit is not barred by Eleventh Amendment immunity, because Defendants are sued in their official capacities for prospective injunctive and declaratory relief per the *Ex parte Young* doctrine.  *Ex parte Young,* 209 U.S. 123, 159-60 (1908); *Kentucky v. Graham*, 473 U.S. 159, 167 fn. 14 (1985); *Harris v. Owens,* 264 F.3d 1282, 1290 (10th Cir. 2001).

5.     The Due Process Clause of the Fourteenth Amendment requires due process when a person may be deprived of life, liberty or property.  U.S. Const. amend. XIV, § 1.  The Due Process Clause "shields from arbitrary or capricious deprivation those facets of a convicted criminal's existence that qualify as 'liberty interests.'" *Harper v. Young*, 64 F.3d 563, 564 (10th Cir. 1995), *aff'd*, 520 U.S. 143 (1997); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) ("[t]he touchstone of due process is protection of the individual against arbitrary action of government

whether the fault lies in a denial of fundamental procedural fairness or in the exercise

of power without any reasonable justification on the service of a legitimate

governmental objective").  Before determining whether Plaintiff's procedural or

substantive due process rights have been violated, I must first determine whether

Plaintiff has a liberty interest.

B.      Liberty Interest in Sex Offender Treatment

        6.      I previously granted Plaintiff's Rule 56(a) Motion for Summary Judgment

to the extent Plaintiff asserted he has a liberty interest in continued treatment as a sex

offender under Colo. Rev. Stat. §18-1.3-1004(3).  *See* February 14, 2006, Order

Affirming and Adopting Recommendation of United States Magistrate Judge, at 5.

        7.      My initial ruling in *Beebe v. Heil*, 333 F. Supp. 2d 1011 (D. Colo. 2004)

provides the underpinning for this decision.  In denying Defendant's motion for

judgment on the pleadings, I found as follows:

> In *Sandin v. Conner*, the Supreme Court held that a court determining
> whether a liberty interest created by state law warrants due process
> protection must assess the "nature" of the interest and whether the
> Plaintiff's being deprived of it has caused the inmate to suffer "a 'grievous
> loss' of liberty retained even after ⋯ imprisonment."  *Sandin*, 515 U.S. at
> 480, 481, 115 S.Ct. 2293 [1995].  The Court clarified that such
> state-created liberty interests are "generally limited to freedom from
> restraint which ⋯ imposes atypical and significant hardship on the inmate
> in relation to the ordinary incidents of prison life."  *Sandin*, 515 U.S. at
> 484, 115 S.Ct. 2293.  However, the Court has also recognized that a
> "major change" in a prisoner's conditions of confinement may amount to a
> "grievous loss" to the prisoner.  *See Wolff* [*v. McDonnell*], 418 U.S. [539],
> 572 n. 19, 94 S.Ct. 2963 [1974] (noting that "major change" can constitute
> constitutionally cognizable deprivation), *Vitek v. Jones*, 445 U.S. 480,
> 492, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (noting with approval district
> court finding that increased stigma suffered by prisoner transferred to
> mental hospital, plus accompanying increased restrictions on freedom,

plus compelled treatment in mandatory behavior modification program constitutes "grievous loss").

*Id.* at 1016-17.

8.      I further found in *Beebe* that "[t]he withholding of treatment, then, would work a 'major change in the condition of [Plaintiff's] confinement' . . . since his status would change from 'eligible to be considered for parole' to 'ineligible to be considered for parole.'" *Id.* (quoting *Vitek*, 445 U.S. at 492).  I also stated therein:

> Colorado has created a scheme in which a sex offender is required to undergo treatment and in which the Colorado Department of Corrections lacks discretion to withhold treatment.  COLO. REV. STAT. §§ 18-1.3.1004(3), 16-11.7-105.  Such a change would, without doubt, have a serious impact on a prisoner's morale, outlook, hope for the future, and motivation to pursue rehabilitation.  As such, there can be no serious dispute that the deprivation of treatment amounts "to a grievous loss to the inmate."

*Id.* (quoting *Vitek*, 445 U.S. at 492).

9.      I expanded on that ruling in the February 14, 2006, Order Affirming and Adopting Recommendation of United States Magistrate Judge ["February 2006 Order"].  That Order affirmed a Recommendation of Magistrate Judge Boland that Plaintiff's Motion for Summary Judgment be granted to the extent it asserted that Plaintiff has a liberty interest in continued treatment as a sex offender under COLO. REV. STAT. § 18-13-1004(3), and that Defendants' Motion for Summary Judgment be denied.  In affirming the Recommendation, I overruled objections by Defendants that the Court's interpretation of the statute that "participation in a treatment program is an absolute prerequisite for parole" was improper as the Court had not yet had an  opportunity to consider the affidavit of Parole Board Chairman Allan F. Stanley.  *See* Order at 2.

10.     More specifically, Defendants argued in their objections, based on Stanley's affidavit, that sex offenders are not precluded from applying for parole even if they have not completed treatment and that Plaintiff had been considered for parole even though he was terminated from the program. *Id.* at 2-3. Defendants further argued that a sex offender's successful progression in treatment is but one factor the Parole Board considers in making a determination of whether to grant a sex offender parole. *Id.* at 3. Defendants also argued that *Sandin* applied, requiring an atypical and significant hardship, and/or that termination from the sex offender treatment program was not a major change in the condition of Plaintiff's confinement because his status has not changed from "eligible to be considered for parole" to "ineligible to be considered for parole." *Id.*

11.     I overruled Defendants' objections, finding that they were based in large part on Stanley's affidavit and that Magistrate Judge Boland provided well reasoned and sound reasons why the affidavit is not controlling. February 2006 Order, at 3. I further stated:

> As [Magistrate Judge Boland] notes, Mr. Stanley's factual assertions in the affidavit cannot overcome the plain language of the statute that mandates participation in a treatment program as a prerequisite to parole . . . . Further, I agree with Magistrate Judge Boland that the affidavit fails to establish that Plaintiff is actually eligible for parole, even without completion of the treatment program. There is also no evidence that any other inmate has ever been paroled without successful completion of the SOTMP.

*Id.* at 3-4.

12.     Based on the foregoing, I find that there are two independent tests for determining whether there is a protected liberty interest.  In "punishment/restraint" situations, there must be "atypical and significant hardship as compared with other inmates." *Sandin*, 515 U.S. at 472.  In the situation presented here where there is a cessation of state-mandated sex offender treatment, I find that the proper test for deciding whether there is a protected liberty interest is whether there was a "major change in conditions of confinement [amounting to a] grievous loss." *Wolff v. McDonnell*, 418 U.S. 539, 572 n. 19 (1974).

13.     I also find (and reaffirm prior findings) that Plaintiff's termination from state mandated sex-offender treatment constitutes a "major change amounting to a grievous loss", since I find that Plaintiff has gone from eligible for parole to ineligible to parole, as explained below.  I base this on the Colorado statutory scheme, the documentary evidence, and the testimony of Stanley as the Chairman of the Parole Board.

14.     I first address the Colorado statutory scheme.  Two Colorado statutes mandate treatment as a part of incarceration.  COLO. REV. STAT.  § 18-1.3-1004(3) states, "[e]ach sex offender sentenced pursuant to this section shall be required as a part of the sentence to undergo treatment to the extent appropriate pursuant to section 16-11.7-105, C.R.S."  COLO. REV. STAT. § 16-11.7-105(1) states, "[e]ach sex offender . . . shall be required, as a part of any sentence to . . . incarceration with the department of corrections, to undergo treatment to the extent appropriate to such offender. . . ." The legislative purpose of the statutes requiring treatment, as stated in COLO. REV.

STAT. § 18-1.3-1001, is "that the majority of persons who commit sex offenses, if incarcerated . . . without treatment, will continue to present a danger to the public when released from incarceration . . . [and] keeping all sex offenders in lifetime incarceration imposes an unacceptably high cost in both state dollars and loss of human potential."

15.     The statutory scheme further requires that the Parole Board consider whether the sex offender has had successful progression in treatment in determining whether the offender is eligible for parole.  It also requires that a recommendation be made by the Department of Corrections to the parole board as to whether parole is appropriate. Specifically, COLO. REV. STAT. § 18-1.3-1006(1)(a) states:

> In determining whether to release the sex offender on parole, the parole board *shall* determine whether the sex offender has successfully progressed in treatment and would not pose an undue threat to the community if released under appropriate treatment and monitoring requirements and whether there is a strong and reasonable probability that the person will not thereafter violate the law.  The department shall make recommendations to the parole board concerning whether the sex offender should be released on parole . . . .

*Id.* (emphasis added).

16.     The administrative regulations and standards submitted into evidence further demonstrate that treatment is a prerequisite to parole.  Specifically, as referenced in the Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders issued by the Colorado Sex Offender Management Board, criteria for release from parole include "[r]equired participation" in the SOTMP, and "[d]emonstrated participation in all recommended programs".  Further, Administrative Regulation 700-19 states that sex offenders serving under the Colorado

Lifetime Supervision Act "must participate and progress in treatment in order to be considered a candidate for parole."

17.     I also find that Stanley himself corroborated the fact that for sex offenders such as Plaintiff that are sentenced under Colorado's Lifetime Supervision Act, successful completion of or, at a minimum, participation in the sex-offender treatment is a prerequisite to parole.  As discussed in the Findings of Fact, Stanley testified that while there is a possibility that some sex offenders may be paroled without participation in the sex offender treatment program or if they were terminated from the program, this possibility does not apply to those sex offenders who have been sentenced under the Colorado Lifetime Supervision Act.  As to the offenders sentenced under the Lifetime Supervision Act, Stanley testified that they must complete sex-offender treatment or at least be actively participating in treatment in order for them to get paroled.

18.     Stanley's testimony is consistent with the administrative regulations, standards and statutory authority discussed above.  Indeed, it strains credulity to believe that the Parole Board would parole a sex offender who has not gotten treatment in the face of that authority and in light of the General Assembly's recognition in enacting the statutory scheme "that the majority of persons who commit sex offenses, if incarcerated . . . without treatment, will continue to present a danger to the public when released from incarceration . . . ."  COLO. REV. STAT. § 18-1.3-1001.

19.     As stated previously in the Findings of Fact, while Stanley later testified somewhat inconsistently with his earlier testimony detailed above, *i.e.*, stating that there is a possibility that a sex offender sentenced under the Lifetime Supervision Act

could get paroled without treatment in prison, I find this later testimony is based on speculation and is not credible given the statutory and administrative scheme in place and his previous testimony.  It is also not credible given the fact that no sex offender has ever been paroled without successful participation in the SOTMP.

20.     I therefore find that while Plaintiff may technically be "eligible" for parole consideration without participation in the SOTMP program, he is not actually eligible to receive parole.  In other words, he will not actually be paroled by the Parole Board without successful progression in treatment.  Accordingly, I find that Defendants' termination of Plaintiff's treatment constitutes a "major change in conditions of confinement [amounting to a] grievous loss."  *Wolff*, 418 U.S. at  572 n. 19; *see also Leamer v. Fauver*, 288 F.3d 532, 544-45 (3rd Cir. 2002) (in case where sex offender was not receiving individual or group therapy as a result of reclassification, Leamer's liberty interest in treatment was found to be "fundamental and cognizable for purposes of both the procedural and substantive due process analyses"; court also noted that therapy was "an inherent and integral part of the scheme, and its deprivation is clearly a grievous loss not emanating from the sentence" where there was an affirmative duty to treat sex offenders, "confinement and treatment are inextricably linked" and "[o]nly successful therapy can shorten his incarceration").

21.     The finding that Plaintiff has suffered a "major change in conditions of confinement [amounting to a] grievous loss" is further strengthened by the fact that the termination from treatment is combined with Defendants' unwillingness to allow Plaintiff to reenter the program unless Plaintiff admits to something he denies doing, *i.e.,*

-20-

unsolicited contact with a minor.  The Third Circuit's ruling in *Leamer* is instructive.

There, as in this case, there was "an affirmative duty to treat" the sex offender.  *Id.* at

545.  Here, also, there is a statutory requirement that Plaintiff receive treatment.

Conditioning the right to reenter the program on Plaintiff's admission that he engaged

in wrongdoing without allowing Plaintiff an opportunity to explain or rebut the charges

against him contributes to the "grievous loss" suffered by Plaintiff.

24.     In so finding, I reject Defendants' argument that I should reconsider my

ruling on this issue.  While Defendants rely on Stanley's testimony at trial, I have

already found his testimony actually supports my finding that Plaintiff is not truly eligible

for parole without at least active participation in treatment.  I further reject Defendants'

arguments based on the Colorado statutory scheme, the administrative regulations and

standards, and for the other reasons discussed above.

23.     Having found that Plaintiff has a liberty interest in sex offender treatment,

I now turn to Plaintiff's procedural and substantive due process claims.

C.     Procedural Due Process Claim

24.     It is undisputed that Defendants did not provide due process to Plaintiff

prior to his termination from the SOTMP.  It is also undisputed that the SOTMP

Termination Guidelines do not afford participants due process prior to termination.  I

find that this violates Plaintiff's right to procedural due process in connection with his

liberty interest in sex offender treatment for the reasons stated in this ruling.

25.     When an inmate alleges a violation of his procedural due process rights,

the Court must determine (1) the appropriate procedural protections due to the inmate

to prevent arbitrary abrogation of the liberty interest, and (2) whether the inmate was afforded those protections. *Wolff*, 418 U.S. at 557. The first issue is thus what process is due Plaintiff.

26.     The Supreme Court in *Wolff* addressed this issue in connection with a class action brought by a prisoner at a Nebraska prison alleging that the rules, practices and procedures of the prison which might result in the taking of good time credits that affect the term of confinement violated the Due Process Clause. *Id.* at 553. The Court first noted that "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Id.* at 556. Thus, "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are applicable." *Id.* In a situation where the state "creates the right to good time", and recognizes "that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." *Id.* at 557.

27.     Turning to what notice was due, the Supreme Court held in that situation that procedural due process required, at a minimum, "advance written notice of the claimed violation and a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken." *Id.* at 563. *Wolff* made clear

-22-

that the written notice must be provided "no less than 24 hours" prior to the hearing or decision-making process.  *Id.*

28.     *Wolff* then discussed the reasons for notice, concluding that "[p]art of the function of notice is to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are, in fact."  *Id.* at 564.  *Wolff* further stated that "the provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights have been abridged, will act fairly."  *Id.* at 565. "Without written records, the inmate will be at a severe disadvantage in propounding his own cause or to defending himself from others."  *Id.*  "Written records of proceedings will . . . protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding."  *Id.*

29.     *Wolff* also held that "the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals."  *Id.* at 566.  Balancing that right with institutional concerns, the Supreme Court stated, "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence."  *Id.*  It further noted that "it would be useful for the [institution] to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual

cases." *Id*. "Any less flexible rule appears untenable as a constitutional matter, at least on the record made in this case." *Id*.; *see also Morrissey v. Brewer*, 408 U.S. 471, 489 (1972) (where parole revocation implicated a liberty interest, the following minimum procedural due process requirements had to be met: "(a) [advance] written notice of the claimed violations . . .; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses . . . ; (e) a 'neutral and detached' hearing body . . . ; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole").

30.     I find the analysis in *Wolff* is applicable to the situation herein.  In *Wolff*, the protected liberty interest arose out of the state providing prisoners a statutory right to good time forfeited only for serious misconduct.  That interest affected length of incarceration.  *Wolff*, 418 U.S. at 557.  In this case, the protected liberty interest arises out of the state's requirement that sex offenders receive treatment as a prerequisite to parole.  Loss of treatment also may affect length of incarceration, since the inmate then becomes ineligible to receive parole.

31.     Defendants appear to dispute that minimum procedural protections set forth in *Wolff* are applicable, and instead rely on *Wilkinson v. Austin*, 545 U.S. 209, 125 S. Ct. 2384 (2005), a case involving the process by which Ohio classified prisoners for placement at its highest security prison, known as a "Supermax" facility.  125 S. Ct. at 2388.  *Wilkinson* found that prisoners had a constitutionally protected liberty interest in avoiding assignment at the Supermax facility, since it found that "assignment to OSP

-24-

imposes an atypical and significant hardship under any plausible baseline." *Id.* at 2394. *Wilkinson* does not support the constitutionality of the process given to Plaintiff, and actually supports my reliance on *Wolff*. In that case, the inmates were afforded the minimal process required in *Wolff*—they were provided notice and a fair opportunity for rebuttal *prior* to their hearing regarding the proposed classification to the Supermax facility. *Id.* at 2390, 2396. The inmates were also allowed to attend the hearing, submit a written statement, and "'offer any pertinent information, explanation and/or objections to [Supermax] placement.'" *Id.* at 2390 (quotation omitted).

32. Turning to the process provided in this case, Plaintiff did not have the opportunity to see or explain the subject letter for which he was terminated, as it was confiscated before he received it, and he did not receive written notice of the charges prior to his termination from the SOTMP. Thus, he was not able to "marshal the facts in his defense" or "clarify what the charges" were before he was terminated from the program. This violates the minimum procedural due process requirements set forth in *Wolff* and *Wilkinson*.

33. In addition, I find that there was a violation of the hearing requirement of procedural due process; namely, Plaintiff was not allowed to call witnesses and present documentary evidence in his defense at a hearing before termination. I further find that Defendants have not shown that permitting Plaintiff to have such a hearing would be unduly hazardous to institutional safety or correctional goals.

34. In so finding, I reject Defendants' argument based on the testimony of Chapman that due process proceedings cannot be accommodated in a therapeutic

setting as they would necessitate the involvement of third persons who would be inexperienced and untrained in the dynamics of sex offenders, and that it would also be a violation of confidentiality, jeopardizing the therapeutic process. Pursuant to the CDOC's own grievance process, the final step in the formal grievance process requires that the grievances be submitted to a Step III grievance officer who is an independent contractor and not a CDOC employee or SOTMP counselor. This person is a third party that is not trained in the dynamics of sex offenders, and a written statement by the inmate and/or a hearing before that officer would necessarily involve waivers of confidentiality regarding the therapeutic process.

35.     I find that the process that should occur prior to termination is no different than that required after termination. In both settings, the sex offender terminated from the program (in this case Plaintiff) would be the party presenting rebuttal to the recommendation of termination from the SOTMP, and would be the one deciding whether and to what extent he wishes to waive the privilege. The response required by the therapists in the SOTMP program in pre-termination due process proceedings would be no different than that required after termination, and would pose no greater threat of disclosure of confidential information. Indeed, Chapman acknowledged this on cross examination. Accordingly, I find that the argument propounded by Defendants that due process cannot be granted prior to termination simply does not have validity.

36.     In conclusion, I find that Plaintiff has shown a violation of his constitutional right to procedural due process. Judgment will be entered in favor of Plaintiff and against Defendants on this claim.

D.    Substantive Due Process Claim

37.    I next consider whether Defendants violated Plaintiff's substantive due

process liberty interest in sex offender treatment by terminating his treatment in such a

manner that was shocking to the conscience.

38.    As stated in a prior decision in this case, "'the Due Process Clause

contains a substantive component that bars certain arbitrary, wrongful government

actions 'regardless of the fairness of the procedures used to implement them.'" *Beebe*

*v. Heil*, 333 F. Supp. 2d 1011, 1017 (D. Colo. 2004) (quoting *Zinermon v. Burch*, 494

U.S. 113 (1990) (further quotation omitted).   "In evaluating Plaintiff's substantive due

process claim, the Court must consider whether Defendants . . . 'have been deliberately

indifferent to a liberty interest and deprived [Plaintiff] of that interest in such a manner

that behavior of the government officer[s] is so egregious, so outrageous that it may

fairly be said to shock the contemporary conscience." *Id.* at 1017-18 (internal quotation

marks omitted) (quoting *Leamer v. Fauver*, 288 F.3d 532, 547 (3rd Cir. 2002); *County*

*of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998)).   The standard for judging

whether the actions are shocking to the conscience is "whether the challenged action

would 'shock the conscience' of a federal judge." *Uhlrig v. Harder*, 64 F.3d 567, 573

(10th Cir. 1995) (quoting *Collins v. Harker Heights,* 503 U.S. 115, 126 (1992)).

39.    A § 1983 claim for substantive due process "must be predicated on a

state action manifesting one of two traditional forms of intent—that is, either: (1) an

intent to harm; or (2) an intent to place a person unreasonably at risk of harm." *Uhlrig*,

64 F.3d at 573.   "While 'an intent to harm' follows the traditional tort law concept of

intentionality, [the Tenth Circuit] ha[s] defined 'an intent to place a person unreasonably at risk' (or reckless conduct) as when a state actor 'was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences.'" *Id.* at 573-74 (quotation omitted).  However, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. . .— the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.*

40.    Whether action of the government actor is conscience shocking depends on the circumstances of the case and the environment in which the action occurs. "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."  *Lewis*, 523 U.S. at 850.  As the Third Circuit stated, "[t]he Supreme Court has noted that, in a prison setting, the opportunity for deliberation may make the test more easily satisfied than in, for example, the setting of a police chase . . . . under rapidly evolving situations requiring immediate responses . . . such as the high-speed chase that was at issue in *Lewis*, there can be no liability without an 'intent to harm. . . . '"  *Leamer*, 288 F.3d at 547 (quoting *Lewis*, 523 U.S. at 854).

41.    However, in prison situations where there is an opportunity to deliberate, the threshold for liability is lower.  "As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical, . . . and in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare."  *Lewis*, 523 U.S. at 851.  *Lewis* further stated:

> To recognize a substantive due process violation in . . . circumstances [of a high speed chase] would be to forget that liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations.  When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.

*Id*. at 853.

42.    The Third Circuit in *Leamer*, relying on *Lewis*, indicated that there may be a viable substantive due process argument in a similar context.  In that case a sex offender who was reclassified stopped receiving therapy that was mandated by the statutory scheme and was required to shorten the term of incarceration".  *Id*.  The Third Circuit held that where "the authorities were not merely supposed to reflect and care, but in addition were to carry out a prescribed course of treatment", the conduct of the authorities could be conscious shocking under *Lewis*.  *Id*. at 547.  The case was remanded to the district court to decide whether the conduct was conscious shocking, focusing on "the challenged abuse of power by officials in denying Leamer the

treatment regimen that was statutorily mandated and was necessary in order for his condition to improve, and thus for him to advance toward release." *Id.*

43.    In the case at bar, Defendants purposefully, with opportunity to deliberate, terminated Plaintiff from sex offender treatment without the minimum protections afforded under procedural due process, as discussed above.  There was clearly an "extended opportunity to do better" in this case.  The "decisional" time period spanned three and one-half months from the initial May 15, 2002, termination to the August 30, 2002, date when the final CDOC determination letter was issued.  Further, Chapman testified that it was irrelevant to her decision to terminate treatment that Plaintiff did not know the person he wrote the letter to was a minor, because it was incumbent on him to verify that any person he had contact with was not a minor before the contact.  However, Plaintiff was not terminated from the program because he failed to verify that the person he wrote was a letter.  Further, other persons who had accidental contact with a minor were not terminated from the program.  The termination of Plaintiff from the program without giving Plaintiff adequate notice to dispute these charges and present evidence on this issue shows deliberate indifference to Plaintiff's rights.

44.    Additionally, Defendants ignored and were indifferent to the statutory requirement mandating sex offender treatment by unreasonably refusing Plaintiff reentry into the program.  Indeed, Defendants premised reentry into the program, among other things, on Defendant's admission of wrongdoing for which he was denied due process in the first place, *i.e.*, the alleged contact with a minor.  In so doing, Defendants ignored the fact that Plaintiff contended that he did not know the person

was a minor, and ignored the wording on the face of the letter that lends some support

to this claim as the minor announced her age as if for the first time ("I'm Michelle, 17 yrs

of age"). This conduct is unreasonable and also demonstrates deliberate indifference

to Plaintiff's statutory right to treatment.

45.    Defendants' termination of Plaintiff from the SOTMP program as well as

their unreasonable refusal to allow Plaintiff to reenter the program has caused

substantial harm to Plaintiff.  As a result, Plaintiff has not received treatment since he

was terminated from the program on May 15, 2002.  Further, it appears that unless the

Court intervenes, he will continue to be denied treatment indefinitely.  Unless and until

Plaintiff admits that he knowingly contacted a minor, a fact which he disputes and for

which he did not receive due process, he will continue to be denied treatment.  The end

result of this is that Plaintiff is and will continue to be parole ineligible, since successful

progression in treatment, or at the very least, active participation in treatment, is

required for Plaintiff to receive parole.  Defendants knew or should have known that

their conduct resulted in Plaintiff becoming and staying parole ineligible since 1992,

and I find that Defendants have been deliberately indifferent to Plaintiff's rights.  I

further find that Defendants' respective actions in terminating or causing Plaintiff to be

terminated from treatment and denying him reentry into treatment in the manner

described above shocks the contemporary conscience and is shocking to the

conscience of this federal judge.  *See Lewis*, 523 U.S. at 823 ("When such extended

opportunities to do better are teamed with protracted failure even to care, indifference

is truly shocking").

46.     Accordingly, I find that Plaintiff has established a violation of substantive

due process.  Judgment will be entered in favor of Plaintiff and against Defendants on

this claim.

47.     I further find that because Plaintiff's liberty interest in sex offender

treatment and due process protections was violated by his removal from treatment, the

appropriate remedy is reinstatement into the program.  Defendants shall reinstate

Plaintiff into sex offender treatment forthwith.  Once in the program, however, Plaintiff

will be required to comply with the rules and regulations regarding such treatment.

E.      Whether the CDOC Regulation is Unconstitutional and Invalid

48.     Finally, I am asked to determine whether the CDOC regulation at issue,

CDOC Regulation 700-19, that addresses preconditions and conditions to receipt of

sex offender treatment and vests CDOC therapists and personnel with discretion to

terminate treatment for alleged violations of same without certain due process

protections, is unconstitutional.  Plaintiff contends that the regulation is unconstitutional

on its face as it violates his substantive liberty interest in unconditional state mandated

treatment.  Plaintiff also asserts that the regulation is unconstitutional because it does

not allow for procedural due process.

49.     I first find that because Plaintiff was terminated from sex offender

treatment in accordance with the CDOC Regulation, he has standing to challenge the

constitutionality of the Regulation.  *Pennel v. City of San Jose,* 485 U.S. 1, 8 (1988).

Defendants do not dispute this finding.

50.     Turning to the merits of this issue, I find that the regulation is unconstitutional to the extent that it does not allow for the minimum protections of the due process clause; namely, "advance written notice of the claimed violation [no less than 24 hours prior to the hearing or decision making process] and a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken." *Wolff*, 418 U.S. at 563.  Defendants are ordered to reformulate the regulation and/or issue new termination procedures that provide for such process for the protection of inmates sought to be terminated from state-mandated sex offender treatment.  In the interim, until the regulation is reformulated or the new procedures are implemented, Defendants are ordered to provide the above-stated due process protections to inmates who may be facing termination from the SOTMP.

51.     The regulation also does not allow inmates facing termination from the SOTMP "to call witnesses and present documentary evidence in his defense."  *Id.* at 566.  While I found that this was improper in this case since Defendants did not present any legitimate institutional safety or correctional goals that would be compromised by such process, I decline to find the regulation unconstitutional as to this issue.  Instead, when the regulation is reformulated to allow for procedural due process, the CDOC should determine whether allowing a hearing where the inmate can call witnesses and present documentary evidence in his defense would be "unduly hazardous to institutional safety or correctional goals."  *Id.*  If the CDOC determines that such a hearing would not be unduly hazardous, it must allow for this process.

52.     I decline to find the regulation unconstitutional to the extent it imposes preconditions and conditions to receipt of sex offender treatment.  Plaintiff relies on the Third Circuit's decision in *Leamer* to support his argument.  *Leamer* noted for purposes of finding a liberty interest in sex offender treatment that where "the state has created a scheme in which therapy is both mandated and promised, the Department of Corrections is without discretion to decline the obligation."  *Id.* at 545.  Further, the Department of Corrections "has an affirmative duty to treat" the inmate which "is not conditioned on [his] ability to fit into a particular modality."  *Id.*

53.     In this case, I agree with Plaintiff that there is a statutory duty to provide treatment.  COLO. REV. STAT. §§ 18-1.3-1004(3) and 16-11.7-105(1).  However, I find that the treatment is not conditioned on the ability of the offender "to fit a particular modality", as in *Leamer*.  In that case, the sex offender stopped receiving individual and group therapy after he was placed in a "Close Custody Unit" and assigned a "Restricted Activity Program" ["RAP"] status.  *Leamer*, 288 F.3d at 535.  The inmate alleged that the RAP assignment "precluded any group or individual therapeutic contact."  Thus, the treatment was conditioned on the ability of the inmate "to fit a particular modality", *i.e.*, non-RAP status.  Here, however, there is no evidence that the preconditions and conditions to receipt of sex offender treatment condition treatment on the inmate fitting into a particular modality.  Instead, the conditions address the inmate's willingness and ability to comply with the rules and regulations governing treatment, including the rule prohibiting contact with a minor.

54.     The CDOC certainly has the right, and indeed the obligation, to issue rules and regulations governing sex offender treatment.  Deference must be given to the CDOC to determine what rules and regulations are necessary to ensure successful treatment that meets institutional concerns.  *See Turner v. Safley*, 482 U.S. 78, 89 (1987) ("'prison administrators. . ., and not the courts [are] to make the difficult judgments concerning institutional operations'" (quoting *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 128 (1977)).  Plaintiff has not shown that the preconditions and conditions to treatment are unconstitutional.  He also has not shown that these conditions are not reasonably related to legitimate penological objectives and/or that the conditions are an "exaggerated response" to these concerns.  *Id.* at 87.

III.     CONCLUSION

Based upon the foregoing, it is

ORDERED that judgment shall be entered in favor of Plaintiff and against Defendants on the procedural and substantive due process claims.  It is

FURTHER ORDERED that because Plaintiff's liberty interest in sex offender treatment and due process protections was violated by his removal from treatment, Defendants shall reinstate Plaintiff into sex offender treatment forthwith.  It is

FURTHER ORDERED that the CDOC Regulation at issue in this case is unconstitutional and thus null and void to the extent it does not provide for procedural due process as set forth in the Conclusions of Law.  It is

FURTHER ORDERED that Defendants shall reformulate the CDOC regulation and/or institute new termination procedures that provide appropriate due process protections to inmates sought to be terminated from sex offender treatment.

Dated:  November 13, 2006

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge